Filed 5/22/14  Frontier Land Companies v. Jeld-Wen CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| FRONTIER LAND COMPANIES, | C064351 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. CV025623) |
| v. | |
| JELD-WEN, INC., | |
| Defendant, Cross-complainant and Appellant. | |

Following a jury trial of this suit for breach of contract and indemnity, defendant Jeld-Wen, Inc., appeals from a judgment in favor of plaintiff Frontier Land Companies.[1] Plaintiff, a home builder, sought reimbursement for repairs incurred as a consequence of

---

[1]  Defendant cross-complained against Frontier Land Companies and others, alleging nonpayment on other projects, but settled with the others, and the trial court granted Frontier's motion for directed verdict on the cross-complaint as barred by the statute of limitations.  The cross-complaint is not at issue in this appeal.

1

defects in windows, glass doors, and frames supplied and installed by defendant in residential housing developments built by plaintiff. Defendant contends the trial court (1) made erroneous rulings that reformed the contracts to add a 10-year guarantee, (2) improperly applied the express indemnity provision, and (3) improperly awarded unreasonable attorney fees and prejudgment interest.

We reverse and remand regarding prejudgment interest but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case proceeded to trial on four counts: (1) breach of contract, (2) breach of implied warranty of merchantability, (3) express contractual indemnity, and (4) implied contractual indemnity.[2] Plaintiff initially claimed damages of $39,122.18 but continued to incur additional damages, and by the time of trial, the damages demand had risen to $245,066.82.

### Trial Evidence

**Background**

Plaintiff builds and sells homes in the Central Valley. Defendant manufactures, sells, and installs windows and sliding glass doors. In January 1999 plaintiff and defendant entered into a written Subcontract Agreement for defendant to provide and install windows and sliding glass doors for the initial phase of plaintiff's LeBaron Estates subdivision in Stockton. In March 1999 plaintiff and defendant signed a second contract for an additional phase of the LeBaron Estates subdivision. The parties refer to the two LeBaron contracts as one contract. In January 2000 plaintiff and defendant signed a third contract for defendant to provide and install windows and screens for the Villa Ticino subdivision in Manteca. In November 2000 plaintiff and defendant entered a fourth

---

[2] A count alleging breach of implied warranty of fitness was dismissed during trial.

contract for defendant to supply and install windows, patio doors, and screens at the Terra Bella subdivision in Modesto.

Plaintiff also purchased windows and doors from defendant for four other subdivisions (Harvest Creek, Orchard Park, Tessie Estates, and Westbrook), but without written contracts.

**Express Guaranty**

Each of the contracts between plaintiff and defendant contained the following clause:

"11. **EXPRESS GUARANTY**: *In addition to and without limiting Subcontractor's liability or responsibility for the Work*, Subcontractor expressly guarantees its obligation under this Subcontract Agreement, including, but not limited to any defect in workmanship or materials, which occur [*sic*] within two (2) years from the date of the close of the initial escrow on the Work (i.e., as a new home) to Contractor's homebuyers, regardless of the cause of such defects, except where such defects are solely caused by a third party or by Contractor's homebuyer. In this regard, Subcontractor agrees to promptly perform all warranty work requested by Contractor and shall keep appropriate personnel available 7 days per week to service homeowner warranty claims in a timely fashion. . . ." (Italics added.)

**Default Provision–Defective Materials/Substandard Work**

Each contract also stated in paragraph 12 that defendant would be in default of the contract if defendant "furnishes defective material or does substandard work."

**Express Indemnity Provisions**

Each contract contained an express indemnity provision in paragraph 10, though the language differed.

The LeBaron Estates contracts required defendant to "indemnify and hold Contractor harmless from and against any and all claims, actions, demands, damages, liabilities, fines, costs and attorney's fees arising from or related in any way to the Work

3

including, without limitation, any and all claims arising from any condition of the Work or arising from any breach or default on the part of Subcontractor in the performance of any requirement of this Subcontract Agreement, or arising from any act or alleged act of negligence of Subcontractor, or any of its agents, subcontractors, servants, employees, or licenses [*sic*], arising from any accident, injury or damage whatsoever caused to any person, or entity, except such claims as are exclusively caused by the sole negligence of Contractor."

The Terra Bella contract required defendant to "defend, indemnify and hold Contractor and Owner, its parent company, subsidiaries, partners and affiliates harmless from and against any and all loss, expense, liens, claims, demands, and causes of action of every kind and character (including those of the parties, their agent and employees) for death, personal injury, damage to property of subcontractor and third party fines or penalties, including costs, attorneys' fees and settlements arising out of or in any way connected with or alleged to be arising out of or connected with the performance of work under this agreement, by act of [*sic*] omission,[3] whether performed by Subcontractor or any other subcontractor or any independent contractor or any agent, employee, invitee or licensee of the parties, whether resulting from or contributed to by (a) the negligence in any form, whether active or passive, except the sole negligence or willful misconduct of

---

[3] Some of the contracts appear to contain typographical errors by stating "act of omission" rather than "act or omission." No one makes an issue of this on appeal. To the contrary, defendant quotes the contracts as stating "act or omission." In discussing the special jury instruction on indemnity (fn. 8, *post*), the trial court asked counsel, "Do you want me to take out the words 'act of omission'? I mean, it appears in some of the contracts, but I think it's another way of saying negligence." Both sides agreed to this particular change, and the trial court accordingly instructed the jury that plaintiff must prove damage "caused by an act of negligence or breach of contract." The court also instructed that, for breach of contract, the jury must find defendant "failed to do something that the contract required it to do" and that negligence can occur "by acting or by failing to act."

Contractor or owner, its parent company, subsidiaries, partners, and affiliates, its agents, employees, and other independent contractors directly responsible to it, or (b) any defect in, or condition of the premises on which the work is to be performed or any equipment thereon or any materials furnished by Contractor.  Subcontractor shall be solely responsible for loss to or damage of all materials, equipment and work hereunder until the Contract is completed to Contractor's and Owner's satisfaction.  Subcontractor further agrees to use proper care and caution in the performance of its work hereunder so as not to cause damage to any adjoining or other property.  Subcontractor does expressly assume, to the extent of the work covered by this Subcontract, all of the indemnification provisions and guarantees imposed on the Contractor by the construction contract between Contractor and Owner, if any.  [¶]  The defense obligation contemplated herein is contingent only upon the tender by Contractor or Owner to Subcontractor of a claim which wholly or partially comes within the ambit of the above, and Subcontractor shall pay promptly when due and as incurred all attorney's fees and costs generated in the defense of Contractor or Owner, as to the entire action and including bonds and the costs of appeal.  No obligation of Subcontractor to Contractor or Owner shall be lessened, reduced, delayed of [*sic*] affected by the existence of other potential or actual indemnitors or insurers, or by Subcontractor's rights against any third party to contribution, subrogation or proration."

The Villa Ticino contract, which was signed before the Terra Bella contract, contained the same indemnity clause as the Terra Bella contract, but with handwritten and initialed interlineations deleting some of the words, such that the Villa Ticino contract required defendant to "defend, indemnify and hold Contractor and Owner, its parent company, subsidiaries, partners and affiliates harmless from and against any and all loss, expense, liens, claims, demands, and causes of action ~~of every kind and character~~ (including those of the parties, their agent and employees) for death, personal injury, damage to property of subcontractor and third party fines or penalties, including costs,

5

attorneys' fees and settlements ~~arising out of or in any way~~ connected with ~~or alleged to be arising out of or connected with~~ the performance of work under this agreement, by act of [*sic*] omission, ~~whether~~ performed by Subcontractor ~~or any other subcontractor or any independent contractor or any agent, employee, invitee or licensee of the parties, whether resulting from or contributed to by (a) the negligence in any form, whether active or passive, except the sole negligence or willful misconduct of Contractor or owner, its parent company, subsidiaries, partners, and affiliates, its agents, employees, and other independent contractors directly responsible to it, or (b) any defect in, or condition of the premises on which the work is to be performed or any equipment thereon or any materials furnished by Contractor. Subcontractor shall be solely responsible for loss to or damage of all materials, equipment and work hereunder until the Contract is completed to Contractor's and Owner's satisfaction.~~[4] Subcontractor further agrees to use proper care and caution in the performance of its work hereunder so as not to cause damage to any adjoining or other property. Subcontractor does expressly assume, to the extent of the work covered by this Subcontract, all of the indemnification provisions and guarantees imposed on the Contractor by the construction contract between Contractor and Owner, if any. [¶] The defense obligation contemplated herein is contingent only upon the tender by Contractor or Owner to Subcontractor of a claim which wholly ~~or partially~~ comes within the ambit of the above, and Subcontractor shall pay promptly when due and as incurred all attorney's fees and costs generated in the defense of Contractor or Owner, as to the entire action and including bonds and the costs of appeal. No obligation of Subcontractor to Contractor or Owner shall be lessened, reduced, delayed of [*sic*]

---

**4** Some of the handwritten and initialed strikethroughs in the trial exhibit appear to skip an isolated word here and there, e.g., "any equipment thereon," in a way that would not make sense. Our reading of the strikethroughs above is consistent with defendant's quotation of the indemnity clause in its opening brief on appeal.

affected by the existence of other potential or actual indemnitors or insurers, or by Subcontractor's rights against any third party to contribution, subrogation or proration." (Strikethroughs in original.)

**Attorney Fees**

Each contract provided for attorney fees in paragraph 18: "The prevailing party in any dispute arising out of this Subcontract Agreement shall be entitled to promptly receive its reasonable attorney's fees in addition to other relief granted by the court therein."

**Integration Provision**

Each contract provided in paragraph 20 that the contract was fully integrated and oral modifications were prohibited.

**Homeowner Complaints and Defendant's Response**

Between January 1999 and early 2002, defendant supplied and installed windows, sliding glass patio doors, and frames pursuant to the three contracts. Defendant has also installed windows and doors for plaintiff at other subdivisions–Westbrook, Harvest Creek, Tessie Estates, and Orchard Estates–but without formal written contracts. Defendant's performance on those jobs is not at issue here.

Beginning in 2002 and continuing to 2009, plaintiff received complaints from homeowners about windows leaking, dual-pane windows becoming obscured by condensation, and one sliding glass door that was the wrong size. The condensation problem is known as "seal failure" of the hermetic seals between the dual pane glazing or a failed insulated glass unit. Defendant does not deny the seal failures were defects but views the condensation problem as "aesthetic only."

Plaintiff notified defendant, which initially responded and made repairs. However, defendant stopped responding, which forced plaintiff to hire a third party to perform the repairs as complaints continued to come in. Plaintiff claimed that out of 653 homes, 259 had window problems, 168 of which were ignored by defendant.

Plaintiff sent "backcharges" to defendant for reimbursement of these expenses, including a 15 percent administrative charge authorized by contract.[5] Defendant refused to pay, claiming the work was not within the scope of defendant's limited warranty to homeowners.[6] Plaintiff said the first time plaintiff ever heard of defendant's independent limited warranty to homeowners was in 2005.

Defendant also asked plaintiff to have homeowners contact defendant directly with any complaints. Although this deviated from plaintiff's standard practice, plaintiff acquiesced. However, defendant failed to respond to homeowner complaints or simply dropped off replacement windows, leaving the homeowners to their own devices for installation, purportedly pursuant to defendant's limited warranty with the homeowners. Because defendant refused to install the replacement windows and doors, plaintiff had to hire another subcontractor to do the work. Plaintiff hired Glass Doctor, an authorized dealer for defendant's products that could obtain replacement glass from defendant free of charge.

At trial, plaintiff claimed damages of $245,066.82, of which $180,938.39 was for seal failures. Defendant claimed plaintiff's damages were, at most, $7,309.99 for defects

---

[5] The contracts stated in paragraph 13: ". . . For purposes of any default by Subcontractor in this Subcontract . . . , Contractor shall be entitled to backcharge and receive from Subcontractor not less than Contractor's actual labor and material costs and expenses, plus fifteen percent (15%) overhead for such warranty work, and/or Contractor's out-of-pocket costs and expenses, as the case may be."

[6] The portion of the limited warranty quoted in defendant's opening appellate brief stated in part: "Should a wood or vinyl window, patio door or component part be proven defective during the warranty period, the buyer's remedies will be limited to the following at [defendant's] option: (1) repair of the defective product or component part; (2) replacement of the defective product or component part, including the cost of shipping; or (3) reimbursement of the purchase price. These remedies are the only remedies available for breach of warranty or any other legal theory. In no event shall [defendant] be responsible for installation, repainting, refinishing or similar activities connected with the replacement of windows, patio doors or component parts. . . ."

8

within the two-year period of the express guaranty clause of the contracts between plaintiff and defendant.

## Precluded Evidence of Defendant's Limited Warranty

Because defendant wanted to introduce evidence of its own limited warranty to homeowners, which promised only to supply replacement glass, not install it, plaintiff filed a motion in limine to exclude evidence of this limited warranty. Plaintiff asserted that defendant never mentioned the limited warranty until after this lawsuit was filed, and it was irrelevant to the contracts between plaintiff and defendant, which were fully integrated with no mention of the limited warranty and no oral modifications allowed. Defendant argued plaintiff had notice because a sticker affixed to each window said "sold per the terms of Jeld-Wen's limited warranty." The trial court denied plaintiff's motion without prejudice, stating plaintiff could revisit the issue after the presentation of evidence so that the court could rule in context.

After testimony about defendant's limited warranty, including plaintiff's evidence that defendant never mentioned the limited warranty until after plaintiff filed the lawsuit, the trial court revisited the issue sua sponte, struck the evidence of defendant's limited warranty, and excluded further evidence of defendant's limited warranty. Defendant argued the evidence was relevant to explain to the jury why defendant supplied replacement glass without installing it despite claiming its liability had already expired two years after the subcontracts. Defense counsel argued, "How else do I explain -- can I logically explain to the homeowners why we would pay for glass but not pay for labor unless I could show them the warranty that we're relying on in order to do that? [¶] The jury's going to say, 'Well, if you guys paid for glass, you should pay for labor too.' The disclaimers are enforceable under the [Uniform Commercial Code]. They're enforceable under a hundred differ [*sic*] cases. We're only required to do what our warranty says we're required to do." The court asked, "Vis-a-vis the homeowner?" Defense counsel agreed, "Vis-a-vis the homeowner." Plaintiff's lawyer argued the limited warranty would

be relevant if the homeowners sued defendant, but this was a suit between plaintiff and defendant, and there was no limited warranty between plaintiff and defendant.

The court noted, "it seems to me that the way the limited warranty evidence has been used is that it does misdirect the jury. It's often unclear in the questioning of the witnesses -- especially on cross -- which warranty you're discussing on cross-examination. There's been jumping, kind of a picking and choosing of the various things, and they're all kind of pushed together. [¶] . . . I think there has been confusion, and I think you've both seen . . . the latest note from the jurors. [¶] It's not particularly clear, but at least one juror seems to be confused about the ten-year warranty issue . . . [i.e.,] the statute of repose issue . . . ." The trial court excluded the evidence, "both on grounds of relevancy and under Evidence Code [section] 352, for the reasons I've stated." The trial court told the jurors that the evidence about defendant's limited warranty was stricken, and they were to disregard it and not consider it for any purpose.

### Defendant's Motion for Directed Verdict

After the close of plaintiff's case, defendant moved for a directed verdict, arguing that all of plaintiff's damages fell outside the two-year express guaranty clause in the contracts. The trial court denied the motion. Plaintiff asked the trial court to interpret the express guaranty, as a matter of law, as not limiting defendant's liability. Defendant agreed that the trial court should interpret the express guaranty, but asked the court to interpret the clause as a two-year limitation on defendant's liability.

The trial court ruled that the express guaranty did not limit plaintiff's remedies against defendant but instead expressly provided plaintiff with an *additional* remedy during the first two years after close of escrow on each home. The trial court said: ". . . I don't read Paragraph 11 [express guaranty] as limiting the plaintiff's remedies. Paragraph 11 of the contract begins by stating, 'In addition to and without limiting [defendant's] liability or responsibility for the work, [defendant] expressly guarantees its obligation under the subcontract . . . . [¶] This is an enhanced provision. I don't see it as

10

a limitation in any way. It's a contractual provision that provides the contractor with a little bit more than it would normally have, and I don't think it's ambiguous in the least. [¶] Accordingly, I think that it's appropriate to grant plaintiff's motion in the extent they're asking the Court to make a finding as a matter of law. The Court will find that the contract is not ambiguous in the manner urged anyway and that that provision is not a two-year limitation. [¶] Now, a breach of that provision has to come within two years, I think, but the plaintiff is suing for other things, and so in other words, the two-year provision in Paragraph 11 is not properly read as a limitation on all of the contractor's remedies. . . ."

Defendant argued the only alleged breach of the contract was breach of paragraph 11, and therefore plaintiff's contract claim was indeed limited to two years. Defense counsel made this assertion despite plaintiff's counsel having just argued, consistent with its pleading, that it was alleging defendant breached the "default" clause of the contracts in paragraph 12 by "furnish[ing] defective material or do[ing] substandard work." The trial court said it would have to wait "until there's a context."

### Jury Instructions

Defendant also moved, after presentation of plaintiff's case-in-chief, for nonsuit or directed verdict on the express contractual indemnity claims, arguing such claims required a preliminary finding of negligence in order to trigger indemnity, and negligence could not be found here because the "economic loss doctrine" precludes a negligence recovery unless the defective product causes personal injury or damage to property other than the defective product, and no such injury or damage to other property exists in this case. The trial court denied the motion without prejudice. Defendant revisited the matter during discussions about jury instructions. The court deferred the matter to the following day, at which point plaintiff objected that the trial court had reinserted a reference to negligence in the jury instruction, telling the jurors that in order for plaintiff to prevail on express indemnity, plaintiff must prove damage "caused by an act of *negligence or*

11

breach of contract."[7]  (Italics added.)  Plaintiff argued it need only prove breach of contract.  The trial court noted some of the contractual indemnity clauses made reference to "active omission [*sic*]," which implied negligence.  Counsel for both sides said they were "fine" with the instruction as modified, despite defense counsel's having argued the previous day that "or" was not good enough because negligence was a prerequisite for express indemnity.

The trial court also instructed the jury:  "Homebuilders such as [plaintiff] and subcontractors, such as [defendant] can be sued and, depending on the evidence in a particular case, found liable for the reasonable costs to repair latent defects in homes they built for up to ten (10) years after substantial completion of the homes."

The trial court also instructed the jury:  "The two year express guarantee in the contract between [plaintiff] and [defendant] only limits [defendant's] liability under the express guarantee to two years.  It does not limit [defendant's] potential liability under the other portions of the contract or other legal remedies that might be available to [plaintiff]."

## Jury Verdict

On December 18, 2009, the jury returned a general verdict finding in favor of plaintiff on plaintiff's claims for breach of contract, express contractual indemnity, and

---

[7] Special Jury Instruction No. 2 told the jurors:  "[Plaintiff] claims that it was required to repair and/or replace windows sold and furnished by [defendant].  [Plaintiff] seeks to be indemnified by [defendant] for the costs incurred for the Villa Ticino, Lebaron and Terra Bella Subdivisions, pursuant to the express terms of the indemnity provision contained in the written contracts between the parties.  In order for [plaintiff] to recover from [defendant] on this theory, [plaintiff] must prove the following:  [¶]  (1) [Plaintiff] has suffered damages;  [¶]  (2) For damage to property;  [¶]  (3) Arising out of [defendant's] work under the contract, and  [¶]  (4) caused by an act of negligence or breach of contract."

12

implied contractual indemnity, and awarded plaintiff $126,818.62. The jury found in favor of defendant on plaintiff's claim for breach of implied warranty of merchantability.

The trial court entered judgment on December 21, 2009, with the question of costs deferred, and defendant filed a timely notice of appeal.

**Motions for Attorney Fees**

Each side filed a motion for attorney fees. Defendant claimed entitlement because the verdict of $126,818.62 was less than the $137,000 defendant had offered to settle the case before trial under Code of Civil Procedure section 998 (the 998 offer). The trial court ruled that because defendant's 998 offer included fees and costs, plaintiff's preoffer costs and fees had to be added to the jury verdict to determine which party prevailed. When plaintiff's preoffer fees of $166,237.50 and preoffer costs of $10,535.65 were added to the jury verdict, the total was $303,591.77, which was more than defendant's offer of $137,000. The trial court therefore determined plaintiff was the prevailing party and was entitled to an award of attorney fees. Based on the evidence presented, the trial court awarded attorney fees in the amount of $327,553.

The trial court also awarded plaintiff prejudgment interest under Civil Code section 3287, in the amount of $62,054.26.

On May 7, 2010, the trial court entered an amended judgment that incorporated attorney fees, costs, and prejudgment interest. Defendant filed a timely notice of appeal from the amended judgment.[8]

---

[8] Defendant thus appealed from both the judgment and the amended judgment. Where a judgment is modified merely to add costs, attorney fees, and interest–which are separately appealable as postjudgment orders (Code Civ. Proc., § 904.1, subd. (a)(2))–a party wishing to challenge both the final judgment and the postjudgment order normally must file two separate appeals, one from the judgment and a second from the postjudgment order (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 222, criticized on other grounds in *Sanchez v. Strickland* (2011) 200 Cal.App.4th 758, 766).

## DISCUSSION

### I.  Purported Reformation of the Contracts

Defendant argues the trial court improperly reformed the contracts to provide for 10-year guarantees by (a) misinterpreting the two-year express warranty as enhancing rather than limiting liability, (b) instructing the jury on the statutory 10-year limitations period for home construction defects (Code Civ. Proc., § 337.15), and (c) excluding defendant's limited warranty defense.  We are not persuaded.

### A.  Interpretation Of Express Guaranty Clause

Defendant maintains the trial court misinterpreted the two-year express guaranty as an "enhanced provision" rather than a limitation of liability.  We disagree.

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  (Civ. Code, § 1638.)  A trial court's interpretation of a contract as a matter of law is subject to de novo review on appeal, unless its interpretation turns on the credibility of witnesses or resolution of factual disputes.  (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70-71.)

Here, the two-year clause expressly stated, "In addition to and without limiting Subcontractor's liability or responsibility for the Work . . . ."  This express language defeats defendant's proposed interpretation that the clause limits defendant's liability to two years.  When a dispute arises over the meaning of contract language, the court must decide whether the language is reasonably susceptible to the interpretation urged by a party; if it is not, the matter is concluded.  (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878-880, criticized on other grounds as stated in *Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1374-1375; see *id*. at p. 1388, conc. opn. of Kennard, J.)  We conclude, as did the trial court, the contract is not ambiguous and does not limit defendant's liability to two years.

14

In addition to asserting its two-year limitation interpretation, defendant says it anticipates plaintiff will argue, as it did in the trial court, that defendant breached paragraph 12 of the contracts–the default clause stating defendant shall be in default of the contract if it "furnishes defective material or does substandard work." We note this breach of contract theory is consistent with the complaint, which alleged defendant breached the contracts by providing defective products and failing to remedy its defective workmanship and product.

Defendant says paragraph 12 is "clearly inapplicable" because it speaks of breach *during construction* of the project, and plaintiff never claimed during construction that defendant breached paragraph 12. However, the express language of paragraph 12 provides no limitation to breaches that take place during construction, and defendant offers no legal support for the assertion that the paragraph should be read that way.

To the contrary, Code of Civil Procedure section 337.15[9] allows 10 years to make a claim by filing an action for latent defects in construction, and defines "latent

_____

[9] Section 337.15 of the Code of Civil Procedure provides in pertinent part that, except for actions based on willful misconduct or fraudulent concealment: "(a) No action may be brought to recover damages from any person, or the surety of a person, who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for any of the following:
"(1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property.
"(2) Injury to property, real or personal, arising out of any such latent deficiency.
"(b) As used in this section, 'latent deficiency' means a deficiency which is not apparent by reasonable inspection.
"(c) As used in this section, *'action' includes an action for indemnity* brought against a person arising out of that person's performance or furnishing of services or materials referred to in this section, except that a cross-complaint for indemnity may be filed pursuant to subdivision (b) of Section 428.10 in an action which has been brought within the time period set forth in subdivision (a) of this section." (Italics added.)

15

deficiency" as "a deficiency which is not apparent by reasonable inspection." (§ 337.15, subd. (b).) Defendant does not claim or demonstrate that the defects were patent as opposed to latent.

We conclude, as did the trial court, that the two-year express guaranty clauses did not limit defendant's liability to two years but, rather, imposed enhanced responsibilities for prompt service for the first two years. Thereafter, the default provisions in paragraph 12 provided a basis for liability.

### B. Jury Instruction Regarding 10-Year Liability

In accordance with Code of Civil Procedure section 337.15 (see fn. 10, *ante*), the trial court instructed the jury with "Special Jury Instruction No. 3," as follows: "Homebuilders such as [plaintiff] and subcontractors, such as [defendant] can be sued and, depending on the evidence in a particular case, found liable for the reasonable costs to repair latent defects in homes they built for up to ten (10) years after substantial completion of the homes."

On appeal, defendant argues this jury instruction essentially reformed the contract to impose a 10-year guaranty instead of the two-year express guaranty. Defendant argues "this is not, and has never been, a construction defect action for latent defects. There are no homeowners that were parties to the litigation. Instead, this is a breach of contract/express indemnity action between a builder and subcontractor."

It does not appear that defendant is arguing the defects were not latent, since defendant cites no evidence on this point. Rather, it appears defendant is arguing the 10-year statute, Code of Civil Procedure section 337.15, applies only when homeowners are parties to the litigation. Defendant cites no authority supporting this proposition. Defendant cites only *Marijanovic v. Gray, York & Duffy* (2006) 137 Cal.App.4th 1262, 1272, an inapposite case where a subcontractor sued a general contractor for malicious prosecution for filing a cross-complaint for indemnity in an underlying suit by a condominium owners association against the general contractor for latent construction

16

defects.  The appellate court held the contractor was entitled to dismissal of the malicious prosecution suit as a strategic lawsuit against public participation.  (*Ibid*.)  *Marijanovic* has no bearing whatsoever on the case before us.  (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 (*Ginns*) [cases are not authority for propositions not therein considered].)

Defendant cites no authority, nor does our research disclose any authority, for the proposition that homeowners are indispensable parties to a suit in order to invoke Code of Civil Procedure section 337.15.  To the contrary, section 337.15 on its face says "No action may be brought" more than 10 years after completion of the project.  It does not say "No homeowner may bring an action" more than 10 years after completion.  Moreover, section 337.15, subdivision (c) expressly defines "action" to include an action for indemnity.  (See fn. 10, *ante*.)

Defendant's position–that plaintiff was required to ignore homeowner complaints and let the homeowners sue–is contrary to the language of Code of Civil Procedure section 337.15, common sense, and public policy and is unsupported by any citation of authority.  We therefore reject it.

### C.  Defendant's Limited Warranty

Under the same heading about alleged contract reformation, defendant argues the trial court improperly excluded defendant's limited warranty and defense.  Again, we disagree.

Defendant argues the trial court's granting of plaintiff's motion in limine to exclude evidence of defendant's limited warranty deprived defendant of a defense and was tantamount to a grant of nonsuit.  Defendant goes on to cite the standard of review for nonsuits, which requires us to view the evidence most favorably to defendant; resolve all presumptions, inferences, and doubts in defendant's favor; and uphold the judgment only if it was required as a matter of law.  (*Edwards v. Centex Real Estate Corp*. (1997) 53 Cal.App.4th 15, 28.)  Defendant argues its limited warranty was relevant to explain why it supplied replacement glass after the contracts' two-year express guaranty expired.

Defendant asserts it wanted to show it supplied uninstalled glass to honor its own limited warranty and was not conceding 10-year liability to install the new glass. Defendant says plaintiff's witnesses admitted that homeowners had only a two-year warranty and that plaintiff made repairs after expiration of the two years as voluntary "customer accommodations."

However, defendant distorts the record. The portion of the transcript cited by defendant shows plaintiff's customer service employee testified she was told when hired "that because of the California state law that we were tied to the homeowner for ten years, so that anything in their home that was defective we would have to take care of for ten years." She testified on cross-examination that a "customer accommodation" is "something that we have done for the homeowner." It is sometimes, but not always, something done to help out the homeowner after the warranty has expired. When asked to agree that all of the charges after expiration of the two-year warranty were customer accommodations, she said, "I would say that some of them were. I couldn't say that all of them were. We had had a situation where we were being bombarded in some of our communities by attorneys in Southern California that were trying to put lawsuits together. We were trying to protect ourselves and our subcontractors by accommodating some of these homeowners trying to, you know, avert a lawsuit basically." The trial court sustained plaintiff's objection to defense counsel's question asking the witness to agree that plaintiff went further than required in order to avoid getting sued. Defense counsel asked, "So is it your testimony that [plaintiff] did things for these homeowners past the expiration of the warranty that we looked at so as to avoid litigation being filed by the homeowners?" The witness replied, "Not always. It depended on the situation. If it was something that was clearly defective and the customer care representative felt that it should not have failed, then those accommodations would be made."

Thus, as can be seen, the record does not support defendant's position that plaintiff said it had no legal liability to repair the defects beyond two years.

18

Moreover, the exclusion of evidence of the limited warranty was not tantamount to a nonsuit.  The standard of review of the trial court's ruling on admissibility of evidence is abuse of discretion.  (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.)  The trial court ruled the evidence was irrelevant and presented a danger of confusing and misleading the jury under Evidence Code section 352, because it was confusing the jury.  Defendant offers no legal analysis or authority related to the court's section 352 ruling, and therefore the contention is forfeited.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

Defendant claims the evidence was relevant to support its position that its act of supplying replacement glass was not a concession of liability under the contracts with plaintiff.  However, plaintiff did not contend at trial that defendant's act of supplying replacement glass constituted a concession of liability; plaintiff merely argued that defendant's act of supplying replacement glass was a concession that the windows were defective.  Plaintiff's case for liability was based on the contract language.  In closing argument to the jury, plaintiff's attorney said defendant's story was that defendant just did what was required under its warranty to homeowners, but as plaintiff's attorney argued to the jury, "that warranty has no application.  The Court has made that ruling.  The warranty between the homeowner and [defendant] has nothing to do with this case and nothing to do with FCB Homes."

We agree. Defendant's limited warranty to the homeowners had no bearing on the rights between plaintiff and defendant.

We conclude defendant fails to show reversible error regarding exclusion of evidence of its limited warranty.  We also conclude defendant fails to show that the trial court improperly reformed the contracts.

## II.  Express Contractual Indemnity

"Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."  (Civ. Code,

19

§ 2772.) Indemnity provisions are to be strictly construed against the indemnitee. (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1278 (*Heppler*).) Where the trial court construes an indemnity provision without the aid of extrinsic evidence, the interpretation is a question of law subject to de novo review. (*Centex Golden Construction Co. v. Dale Tile Co.* (2000) 78 Cal.App.4th 992, 996.)

## A. Negligence

Defendant, mischaracterizing the trial court's ruling, says the trial court properly interpreted the express indemnity clauses as requiring a finding of *negligence* by defendant in order to make defendant liable to indemnify plaintiff–a ruling which defendant characterizes as binding on us under the "law of the case" doctrine. Defendant also contends the court improperly gave a jury instruction (see fn. 8, *ante*) stating that either negligence or breach of contract would suffice.[10] We reject these contentions.[11]

First, the "law of the case" doctrine–which makes *appellate court* rulings binding on subsequent retrial or appeal of the same case–has no application here. (*Provience v. Valley Clerks Trust Fund* (1984) 163 Cal.App.3d 249, 256.)

Second, the trial court *did not* conclude that negligence was a prerequisite to express indemnity in this case. Rather, the trial court concluded the indemnity clause

---

[10] Plaintiff argues defendant has forfeited any challenge to the jury instruction by failing to challenge the instruction in the trial court. We disagree. Although defense counsel ultimately said the instruction was fine, the concession was made after the trial court rejected the defense argument that negligence was a prerequisite. Any further objection would have been futile. (*People v. Johnson* (2004) 119 Cal.App.4th 976, 984.)

[11] The same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551.) However, conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law. (*Ibid.*) Here, it appears that defendant wants negligence to be a prerequisite in order to make the argument that a finding of negligence would not be legally permissible here because of the economic loss doctrine.

could be triggered either by defendant's negligence *or* by defendant's breach of contract in performance of the job it had contracted to do.

Defendant claims the trial court, by stating this case was governed by *Heppler, supra*, 73 Cal.App.4th 1265, must have agreed negligence was a prerequisite for indemnification liability. However, *Heppler* did not hold negligence was a prerequisite in all cases. The *Heppler* court was not asked, and did not decide, whether breach of contract could provide an alternate basis for triggering an indemnity clause. Cases are not authority for propositions not therein considered. (*People v. Barragan* (2004) 32 Cal.4th 236, 243; *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.) " 'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 17, quoting *Ginns*, *supra*, 61 Cal.2d at p. 524, fn. 2.)

In *Heppler*, the litigation arose when homeowners sued a developer for construction defects. The developer filed cross-complaints for contractual indemnity against subcontractors–three of which are of interest to us in this appeal. (*Heppler, supra*, 73 Cal.App.4th at p. 1273.) The indemnity clauses required the subcontractors (1) to indemnify the developer for amounts it might become liable to pay in damages for which the subcontractors were at least partially responsible and (2) to defend the developer against any such damage claims. (*Id*. at pp. 1272-1273; Civ. Code, § 2778 [indemnitee may recover from indemnitor for amounts paid by the indemnitor upon becoming liable and costs incurred by the indemnitee in defending itself against the claim]; *Crawford v. Weather Shield Mfg., Inc*. (2008) 44 Cal.4th 541, 553 (*Crawford*)

21

[§ 2778 sets forth general rules for interpreting indemnity contract unless contrary intention appears in the contract].)**12**

The developer tendered its defense to the subcontractors, which either refused or did not respond to the tender of defense. (*Heppler*, *supra*, 73 Cal.App.4th at p. 1273.) The developer then entered a good faith settlement (1) to pay the homeowners damages for construction defects and (2) to assign its indemnity rights against the nonsettling subcontractors to the homeowners. (*Ibid.*)

The homeowners, standing in the developer's shoes, then sued to recover from the subcontractors on the indemnity claim. (*Heppler*, *supra*, 73 Cal.App.4th at p. 1274.) If the homeowners had prevailed, they would have recovered what the subcontractors would have had to pay the developer under the indemnity contract, i.e., some amount of what the developer paid in damages to the homeowners, as well as the amount the developer had to pay in litigation costs. In a pretrial ruling, the trial court determined plaintiffs would have to prove negligence and causation to trigger the indemnity clauses. (*Ibid.*) The jury returned verdicts in favor of the three subcontractors. (*Ibid.*)**13**

---

**12** Two subcontracts in *Heppler* said the subcontractors would " 'defend [and] indemnify' " the developer for " 'damage to property arising out of or in connection with Subcontractor's . . . performance of the Work and for any breach or default of the Subcontractor in the performance of its obligations under this Agreement. However, this indemnification shall not apply if such claims, demands or liability are ultimately determined to have arisen through the sole negligence of Contractor.' " (*Heppler*, *supra*, 73 Cal.App.4th at pp. 1272, 1277.) The other subcontract said the subcontractor " 'agree[s] to indemnify and save [the developer] harmless against all claims for damages to persons or to property growing out of the execution of the work, and at his own expense to defend any suit or action brought against [the developer] founded upon the claim of such damage . . . .' " (*Id*. at p. 1278.) Some or all of the subcontracts also contained provisions requiring the subcontractors to adhere to a nonnegligent standard of care in the performance of their work. (*Ibid.*)

**13** A fourth subcontractor was found to be at fault in *Heppler*. The homeowners, standing in the developer's shoes, were awarded (1) $139,652 as contractual damages for the

22

As described by the appellate court, "plaintiffs' appeal revolves around the trial court's ruling that the indemnity provisions at issue did not apply unless plaintiffs proved the subcontractors were at fault." (*Heppler*, *supra*, 73 Cal.App.4th at p. 1275.)

Although the trial court had required negligence–rather than negligence *or* breach of contract–the homeowners on appeal never contended that they should be relieved of the burden to prove negligence by virtue of having proved, as an alternate trigger for the indemnity clause, a contractual breach by the subcontractors in the performance of their construction jobs.

The homeowners did complain on appeal that trial court error "resulted in the jury hearing a negligence case rather than a breach of contract case" (*Heppler*, *supra*, 73 Cal.App.4th at p. 1275) and "prevented them from presenting their contract claims to the jury . . ." (*id*. at p. 1285). However, they did not contend the trial court precluded them from showing the subcontractors breached a contractual obligation related to the performance of their construction jobs. The only breach of contract claim raised in the appeal was breach of the indemnity clause (*id*. at pp. 1286-1287), and the homeowners complained on appeal that the trial court's rejection of their proposed jury instructions on breach of contract precluded the jury from considering that theory (*id*. at p. 1286). The appellate court responded there was no need for contract instructions, because the homeowners and the subcontractors "stipulated that [the developer] tendered and the subcontractors rejected the indemnity demands. Given these stipulations, once the jury made its factual determination regarding negligence and causation, the issue of whether there was a breach of contract would follow as a matter of law." (*Id*. at p. 1287.)

We note the court in *Heppler* said the homeowners presented evidence as to the nonsettling subcontractors' "liability for specific defects at the project and the cost of

fourth subcontractor's failure to defend the developer against the homeowners' lawsuit plus (2) $117,000 for damages caused by the subcontractor's negligence. (*Heppler*, *supra*, 73 Cal.App.4th at p. 1274.)

23

repairing the defects." (*Heppler*, *supra*, 73 Cal.App.4th at p. 1286.) But in context, "liability" did not necessarily mean liability as wrongdoers causing harm rather than legal liability as indemnitors. The homeowners made no argument that they presented substantial evidence that the subcontractors did anything to cause the defects. The homeowners were claiming they were denied the right to a jury trial on the indemnity clause and the right to present evidence of the reasonableness of the amount the developer paid to the homeowners. (*Id*. at pp. 1284-1285.) The subcontractors' *liability* as indemnitors would embrace defects caused by others, according to the plaintiffs' theory of the case. Therefore the quoted sentence does not indicate any claim or evidence that the subcontractors did anything to cause the construction defects.

That the homeowners did not assert a contractual breach of the subcontractors' jobs as an alternate trigger for indemnity is apparent from the appellate court's conclusion that the trial court was right to require subcontractor fault, because otherwise, the subcontractors would be placed in the position of liability insurers rather than indemnitors. (*Heppler*, *supra*, 73 Cal.App.4th at p. 1282.) The *Heppler* court said, "parties to an indemnity contract have great freedom of action in allocating risk, subject to certain limitations of public policy. (See, e.g., Civ. Code, § 2782 [construction contracts cannot provide for indemnification for injury caused solely by indemnitee's negligent or willful conduct].) The parties may establish a duty in the indemnitor to save the indemnitee harmless from the results of his or her active negligence–provided the language is sufficiently specific and clear to evidence this intent. [Citation; fn. omitted.] Likewise, the parties may require negligence by the indemnitor as a condition to indemnification [citation], *or they may establish a duty in the indemnitor to save the indemnitee harmless even if the indemnitor is not negligent* [citation]." (*Heppler*, at p. 1277, italics added.) " '[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for

24

the protection at issue, the protection should be afforded.  This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.' ”  (*Id*. at p. 1277, quoting *Rossmoor Sanitation, Inc. v. Pylon, Inc*. (1975) 13 Cal.3d 622, 633.)

Thus, *Heppler'*s focus was on the indemnitor doing something wrong–not whether that wrong had to be a tort as opposed to a breach of contract.

As indicated, cases are not authority for propositions not therein considered. (*Ginns. supra*, 61 Cal.2d at p. 524, fn. 2.)  *Heppler* does not stand for the proposition that negligence by the indemnitor is required in all cases of express contractual indemnity. The *Heppler* court was not required to, and did not, decide whether a contractual breach in performance of construction work, as opposed to negligence, would trigger indemnity.

On a different issue, the California Supreme Court concluded *Heppler* did not stand for a proposition not addressed by the *Heppler* court as asserted by defendants therein.  (*Crawford*, *supra*, 44 Cal.4th at pp. 560-561.)  In *Crawford*, the issue concerned whether an indemnitor had a duty to assume the indemnitee's defense against third party claims regardless of the outcome of that litigation.  (*Ibid*.)  The defendant in *Crawford* “relie[d] heavily on *Heppler*” (*Crawford*, at p. 560), but the *Crawford* court said, “the plaintiffs in *Heppler* did not contend that, even if the indemnity clause in [the] subcontract was triggered only by [the subcontractor's] actual negligence, the duty-to-defend clause applied more broadly.  Accordingly, the *Heppler* court never separately addressed the defense clause of the subcontract, or considered how the particular language of that clause might distinguish it from the indemnity clause.  In affirming the general verdict for [the subcontractor], the court simply assumed that the indemnity and defense provisions of the subcontract were congruent.  [Fn. omitted.]  [¶]  Here, by contrast, we directly confront the relationship, and the distinction between the two clauses. . . .  [W]hatever *Heppler'*s merits on the issues actually considered in that case,

25

we [California Supreme Court] do not find the decision helpful or persuasive on the narrow question before us" (*Crawford*, at p. 561).

Similarly, *Heppler* does not help defendant here because the *Heppler* court did not address the situation with which we are presented.

Here, defendant did breach the contracts by furnishing defective materials or doing substandard work, and the express indemnity clauses are broad enough to encompass such breach. The LeBaron contract required defendant to indemnify plaintiff for claims "arising from any condition of the Work or arising from any breach or default on the part of Subcontractor in the performance of any requirement of this Subcontract Agreement, *or* arising from . . . negligence . . . ." (Italics added.) The Terra Bella contract spoke of claims "arising out of or connected with the performance of work under this agreement, by act of [*sic*] omission, . . ." The Villa Ticino contract spoke of claims "connected with . . . the performance of work under this agreement, by act of [*sic*] omission, . . . performed by Subcontractor . . . ."

We conclude defendant's breach of contract in furnishing defective materials and/or doing substandard work triggered the indemnity clause.

We parenthetically observe that defendant makes no argument whatsoever regarding the verdict finding implied contractual indemnity (which is now viewed simply as a form of equitable indemnity as stated in *Prince v. Pacific Gas & Electric Co*. (2009) 45 Cal.4th 1151, 1157). Any error regarding express indemnity would not require reversal of the judgment unless defendant showed the judgment could not be affirmed on the alternate ground of implied indemnity. (Code Civ. Proc., § 475 [no judgment shall be reversed for error unless the error was prejudicial, and prejudice will not be presumed].) We recognize that an express indemnity clause may in some circumstances be accorded a preemptive effect, displacing any implied rights. (*E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 507-508 ["when parties by express contractual provision establish a duty in one party to indemnify another, 'the extent of *that duty* must be

26

determined from the contract and not from the independent doctrine of equitable indemnity' [but when] the duty established by contract is by the terms and conditions of its creation inapplicable to the particular factual setting before the court, the equitable principles of implied indemnity may indeed come into play"].)  However, defendant makes no appellate argument on this point.  When an appellant fails to raise a point, we may treat it as waived.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)  Thus, even if negligence were required for express contractual indemnity, defendant would still be liable under the implied contractual indemnity cause of action (*Leoni v. Delany* (1948) 83 Cal.App.2d 303, 309 [one count sustained by sufficient evidence and free from error is all that is required to support a verdict]), and any error concerning express indemnity would be harmless, because implied indemnity supplies an affirmative ground to affirm the judgment based on the arguments with which we are presented on appeal.

We conclude defendant fails to show that negligence was a prerequisite to indemnification.

### B.  Economic Loss Rule

Defendant argues the trial court failed to apply the economic loss rule, which precludes recovery for *negligence* unless the defective product causes personal injury or damage to property other than the defective product itself.  (*Aas v. Superior Court* (2000) 24 Cal.4th 627, superseded by statute on other grounds as stated in *Greystone Homes, Inc. v. Midtec, Inc*. (2008) 168 Cal.App.4th 1194, 1202.)  Defendant's argument fails with our rejection of defendant's contention that negligence was a prerequisite for indemnification and the jury's verdict showing the jury found breach of contract.

"[T]he line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory.  [Citation.]"  (*Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 (*Sacramento Regional*).)  "Economic loss" means " ' "damages for inadequate value, costs of repair

27

and replacement of the defective product or consequent loss of profits–without any claim of personal injury or damages to other property . . . .” ’ [Citations.]” (*Ibid*.; *accord*, *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 482.) The expense of repair is purely economic damage. (*Sacramento Regional*, *supra*, 158 Cal.App.3d at p. 294.)

A tort remedy may arise from the negligent performance of a contractual commitment. (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 776.) The economic loss rule allows a plaintiff to recover *in tort* when a product defect causes damage to property other than the product itself, whereas the law of contractual warranty governs damage to the product itself. (*Jimenez*, *supra*, 29 Cal.4th at p. 483.)

Even assuming for the sake of argument that the jury may have found negligence as a predicate for express indemnity, the jury also found defendant breached the contracts, because the jury found in favor of plaintiff on the breach of contract claim. Therefore, we need not address the economic loss argument.

### III. Attorney Fees

Defendant argues the trial court improperly awarded attorney fees to plaintiff and awarded an excessive amount. We again disagree.

### A. Background

On November 18, 2009, before the trial started, defendant made a Code of Civil Procedure section 998 settlement offer of $137,000, with each party to bear its own attorney fees and costs. Plaintiff did not accept the offer and proceeded to trial.

After the verdict, both sides moved for attorney fees under Code of Civil Procedure section 998 (hereafter section 998),[14] which authorizes a fee award to a

---

[14] Section 998 provides, in pertinent part: “(c)(1) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant’s costs from the

28

prevailing party who obtains a better verdict than a pretrial settlement offer, and Civil Code 1717,[15] which authorizes a fee award to the prevailing party in a contract action where the contract provides for attorney fees.

In April 2010 the trial court issued orders denying defendant's motion for attorney fees and granting plaintiff's motion for attorney fees. The order awarding attorney fees to plaintiff stated: (1) plaintiff's action was primarily an "action on a contract" within the meaning of Civil Code section 1717; (2) the contractual attorney fee clauses were drafted in broad terms that supported an award on either a contract or a tort theory; (3) the $327,553 claimed by plaintiff was a reasonable amount for attorney fees; (4) defendant's section 998 settlement offer of "$137,000; inclusive of fees and costs" was clearly and substantially less favorable than the sum of plaintiff's verdict ($126,818.62) plus preoffer costs ($10,535.65) plus preoffer attorney fees ($166,237.50), totaling $303,591.77, exclusive of interest; (5) the attorney fees incurred by plaintiff in prosecuting its contractual and noncontractual claims were inextricably intertwined or inseparable such that it would be both impractical and pointless to parse or allocate; and (6) plaintiff was the prevailing party on both its complaint and defendant's cross-complaint. This order was reflected in the amended judgment.

_____

time of the offer. . . . [¶] (2)(A) In determining whether the plaintiff obtains a more favorable judgment, the court or arbitrator shall exclude the postoffer costs. [¶] (B) It is the intent of the Legislature in enacting subparagraph (A) to supersede the holding in Encinitas Plaza Real v. Knight, 209 Cal.App.3d 996, that attorney's fees awarded to the prevailing party were not costs for purposes of this section but were part of the judgment."

[15] Civil Code section 1717 provides in part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

## B. Analysis

### 1. Code of Civil Procedure Section 998

Defendant argues the trial court improperly added preoffer attorney fees (and costs)[16] to the $126,000 jury verdict in order to conclude that plaintiff obtained a better result than the $137,000 section 998 offer, entitling plaintiff to all attorney fees under section 998. We disagree.

Section 998 is a cost-shifting statute that encourages the settlement of actions by penalizing parties who fail to accept reasonable pretrial settlement offers. (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1116.)

An award of attorney fees is normally reviewed for abuse of discretion, but the application of section 998 to an undisputed set of facts is a question of law subject to independent review. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 797; *Wilson v. Wal-Mart Stores, Inc.* (1999) 72 Cal.App.4th 382, 389.)

"When the defendant's offer includes costs, it is to be compared with the plaintiff's judgment plus preoffer costs including attorney's fees." (*Heritage Engineering Construction, Inc. v. City of Industry* (1998) 65 Cal.App.4th 1435, 1441.)

Though not raised by defendant, we observe that defendant's 998 offer in this case did not expressly "include" fees and costs but instead specified "each party to bear their own attorneys' fees and costs." However, the economic effect is the same.

In *Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, the defendant's 998 offer required each party to bear its own costs and attorney fees. (*Fundamental Investment*, at p. 970.) The appellate court said, "By the express terms of

---

[16] As part of defendant's argument that plaintiff did not obtain a more favorable judgment, defendant argues some of the preoffer costs were not recoverable. We need not address the matter because, even if we disregard the costs, the addition of preoffer attorney fees suffices to push plaintiff's recovery over the $137,000 settlement offer.

the offer plaintiff would receive $80,000 and would not be entitled to recover any prejudgment costs or attorney fees. Thus, the 'terms and conditions' of the offer required an analysis of plaintiff's pre-offer costs to determine whether it in fact achieved an overall better result." (*Id*. at pp. 971-972.)

Similarly, in *Stallman v. Bell* (1991) 235 Cal.App.3d 740, the court held a trial court erred in refusing to consider preoffer costs in determining whether a party had obtained a more favorable judgment than the 998 offer, which provided " 'each side to bear its own costs.' " (*Stallman*, at p. 749; see *id*. at pp. 747-749.) With no focal point, defendant broadly attacks *Stallman* as having been decided before a 1997 amendment of section 998 provided that *postoffer* costs are to be excluded in determining whether the plaintiff obtained a more favorable judgment than the settlement offer. Defendant fails to show why the 1997 amendment should undercut *Stallman*'s discussion of *preoffer* costs. *Stallman* said, "[T]he chief purpose of section 998 is to encourage settlement of litigation without trial by penalizing a party who rejects a reasonable offer and forces the action to proceed to trial. Where . . . a plaintiff's offer includes waiver of costs and the defendant rejects the offer, thereby forcing the matter to a trial, allowing the plaintiff to add costs to the award of damages to determine whether the judgment exceeds the offer is consistent with the statutory purpose. By contrast, precluding plaintiff from doing so, and limiting plaintiff to the damages award for purposes of comparison with the offer, might . . . reward the nonsettling defendants. Such a result is not consistent with the intent of the statute." (*Stallman*, *supra*, 235 Cal.App.3d at p. 750.)

The same applies here to defendant's 998 offer, and we reject defendant's view that our result allows plaintiff to "game" the judicial system.

Accordingly, the trial court properly added preoffer attorney fees to the jury verdict and concluded the judgment exceeded the settlement offer.

## 2.  Civil Code Section 1717

Defendant argues plaintiff was not entitled to any contractual attorney fees under Civil Code section 1717 because it sued for four subdivisions for which it had no contract.  However, defendant fails to confront the real issue, i.e., the trial court found "[t]he attorneys' fees incurred by Plaintiff in prosecuting its contractual and non-contractual claims were inextricably intertwined or inseparable such that it would be both impractical and pointless to parse or allocate."

"Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under [Civil Code] section 1717 only as they relate to the contract action." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129.)  However, "[a]ttorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Id.* at pp. 129-130.)  Where attorney fees are incurred for both contract and noncontract claims that involve common issues, the fee award for both is proper where the claims are " ' " 'inextricably intertwined' " " [citation], making it "impracticable, if not impossible, to separate the multitude of conjoined activities into compensable or noncompensable time units." ' "  (*Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073, 1085.)

Defendant offers no argument whatsoever on the matter of "inextricably intertwined" claims.

We conclude defendant fails to show that plaintiff was not entitled to an award of attorney fees.

## 3.  Amount of Attorney Fees

Defendant argues the award of $327,553 in attorney fees was excessive.  We disagree.

The amount of an attorney fee award is reviewed for abuse of discretion.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)  An abuse of discretion is shown if

the award "shocks the conscience or is not supported by the evidence." (*Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542, 549-550.)

Defendant argues the amount was excessive because it was almost three times greater than the $137,000 verdict. Actually, it was closer to two-and-a-half times the verdict. This does not shock the conscience.

Defendant says $165,237.50 was incurred from January 2005 through November 18, 2009. Defendant fails to explain its point.

Defendant says the fees correspond to 380 hours spent by plaintiff's lawyers during the *years* leading up to trial, with an additional 940.3 hours spent during the two-week jury trial and thereafter. Defendant says the fees are "patently unreasonable." However, defendant offers no reason other than to say the fees were unreasonable for "what was a fairly simple contract dispute."

We reject defendant's reasoning that this was a simple contract dispute, because defendant requested and obtained, from this court, numerous extensions of time to file its opening and reply briefs on the ground, among others, that the issues in this appeal are "very complex and involve the interpretation and application of contracts and warranty principles," as defendant's appellate counsel attested under penalty of perjury.

We conclude defendant fails to show grounds for reversal regarding the amount of the attorney fee award.

## IV. Prejudgment Interest

Defendant argues the trial court improperly awarded prejudgment interest under Civil Code section 3287[17] from the inception of the action, because a majority of the

---

[17] Civil Code section 3287 provides: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and

33

damages were incurred after plaintiff filed the lawsuit, some of them long after the filing of the lawsuit.[18]  Defendant cites a trial exhibit listing the hundreds of charges incurred between 2002 and 2009 for which plaintiff sought reimbursement.  Defendant asks us to vacate or reverse the award in its entirety.  We agree the trial court erred by awarding prejudgment interest before damages were incurred, but the remedy is remand to the trial court to exercise its discretion applying the proper standard.

Civil Code section 3287, subdivision (a) (see fn. 18, *ante*) authorizes a plaintiff to recover prejudgment interest on damages, from the day the right to such damages vests, in any case where damages are liquidated, i.e., certain or capable of being made certain.

Civil Code section 3287, subdivision (b) (see fn. 18, *ante*) gives the trial court the discretion to award prejudgment interest on damages, from a date after the filing of the complaint but before entry of judgment, in *contract* cases on "unliquidated" claims, i.e., " 'where damages can be ascertained only by a judicial determination upon conflicting evidence as to the amount due, . . .' [Citations.]" (*George v. Double-D Foods, Inc.* (1984) 155 Cal.App.3d 36, 46 [quantum meruit is unliquidated claim in that the amount due must be determined from a presentation of evidence as to the extent, character and value of the plaintiff's services].)

"The addition of subdivision (b) [to Civil Code section 3287] created a limited exception to the prevailing general rule that prejudgment interest is not allowed on unliquidated obligations.  [Citation.]  The usual prohibition against such interest is based

---

interest from any such debtor, including [public entities].  [¶]  (b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, *but in no event earlier than the date the action was filed*."  (Italics added.)

[18] The fact that some damages occurred after the filing of the lawsuit is not problematic because "[d]amages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future."  (Civ. Code, § 3283.)

upon the rationale that it is unreasonable to expect a defendant to pay a debt before he or she becomes aware of it or is able to compute its amount. [Citations.] By allowing an award of prejudgment interest, but only for a limited time period and only if the trial court finds it reasonable in light of the factual circumstances of a particular case, Civil Code section 3287, subdivision (b), seeks to balance the concern for fairness to the debtor against the concern for full compensation to the wronged party. [Citations.] An award of prejudgment interest is not automatic. [Citation.]" (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 69.)

We review the award of prejudgment interest for abuse of discretion. (*Gebert v. Yank* (1985) 172 Cal.App.3d 544, 555-556.)

Here, plaintiff's original complaint, filed January 27, 2005, claimed damages of $39,122.18. But plaintiff continued to incur more damages as time passed. Plaintiff's amended complaint, deemed filed on July 18, 2007, claimed damages "in an amount to be determined at trial." At trial in December 2009 plaintiff claimed damages of $245,066.82, of which $180,938.39 was for seal failures. The evidence showed the expenses were broken down into hundreds of individual charges incurred between 2002 and 2009. The jury verdict of December 18, 2009, awarded damages of $126,818.62.

Plaintiff moved for prejudgment interest under Civil Code section 3287, subdivision (a), arguing damages were liquidated, but alternatively arguing that if the court viewed the damages as unliquidated due to the fact the jury awarded less than plaintiff demanded, then plaintiff should receive prejudgment interest under subdivision (b) of section 3287. Defendant opposed prejudgment interest on grounds not reiterated on appeal, which we therefore need not address. Defendant's memorandum of points and authorities opposing prejudgment interest did not raise the point it asserts on appeal, i.e., that it is unfair to impose prejudgment interest on damages before they were incurred. However, defendant did raise the point at the hearing on the motion for prejudgment interest after the trial court had issued a tentative decision. Regarding this new argument,

35

the trial court said, "That's a fair point. I hadn't remembered that when I wrote the tentative. I was thinking in terms of the damages having occurred prior to the filing of the complaint, so it's a good point." Plaintiff's counsel claimed plaintiff had $100,000 of damages when the lawsuit was filed in 2005, and some of those damages dated back to 2003. Defendant did not point out that the original complaint alleged only $39,000 in damages. In discussing whether damages were liquidated, the court noted the amount plaintiff was required to spend to fix the window problems at each home was reflected in the checks plaintiff wrote to the company that installed the new windows, but since the jury awarded less than the total amount requested by plaintiff, it could not be determined which checks were being reimbursed. The trial court "recollect[ed]" on an unspecified basis that the jury awarded 100 percent of the damages claimed for a specific period of time and 50 percent of everything after that, which "works out to the penny," but "that's not something that's necessarily on the record . . . ." Defense counsel said he spoke with the jurors, and "[t]hat isn't how they got to the numbers."[19] The discussion then moved to other topics.

The trial court ultimately issued a written ruling concluding the damages were unliquidated and awarding prejudgment interest under Civil Code section 3287, subdivision (b) on all damages "from the date the action was filed," without mention of the fact that some damages were incurred long after the filing of the lawsuit.[20]

It is improper to award prejudgment interest on damages before plaintiff incurs the damage.

---

[19] Of course, evidence of jurors' mental processes is inadmissible. (Evid. Code, § 1150.)

[20] Even assuming for the sake of argument that the trial court should have concluded damages were liquidated, plaintiff would not be entitled to prejudgment interest on all damages from the date the lawsuit was filed because Civil Code section 3287, subdivision (a) allows interest only from the date the right to damages vests, and plaintiff's right to damages could not vest before plaintiff incurred the damages.

Here, we have as a trial exhibit a list showing the date on which each item of damages was incurred. However, the problem is that these damages add up to $245,000, yet the jury awarded only $126,000, and the record does not reveal which items the jury awarded and which it rejected.

Plaintiff argues it incurred some of the damages in 2002, three years before filing suit and almost eight years before the jury verdict. Plaintiff says it is impossible to determine how the jury calculated the damages and which backcharges it awarded, and that is why the trial court determined the damages were not liquidated. Plaintiff argues it was impossible to parse out the jury's award, and therefore it was appropriate for the trial court to "pick a point," i.e., the day the complaint was filed, that was years after some of the damages were incurred but before other damages were incurred.

However, plaintiff's argument fails because Civil Code section 3287, subdivision (b) prohibits prejudgment interest for the time period before the complaint was filed. Therefore, the court cannot award premature prejudgment interest as a tradeoff for not awarding prefiling interest, because in no case could plaintiff recover prefiling interest.

On appeal, plaintiff does not challenge the trial court's choice of Civil Code section 3287, subdivision (b), rather than subdivision (a), as the basis for the award.

Plaintiff cites *Amador Valley Investors v. City of Livermore* (1974) 43 Cal.App.3d 483 as holding that where damages were continuous through the trial, the trial court did not abuse its discretion in picking a midpoint and awarding interest from that date. That case does not help plaintiff here. There, a landowner sued a city for damages resulting from the city's discharge of sewage water into a creek that flowed through the landowner's property. (*Id*. at p. 488.) The sewage discharge, which continued over time, caused the landowner to incur additional expenses to carry out planned construction. (*Ibid*.) In what was apparently a bench trial, the trial court awarded the landowner all of the additional expenses of $93,182, with prejudgment interest from a date midway

37

through trial. (*Id*. at pp. 488, 495.) On appeal, the city argued the court incorrectly calculated the date upon which interest accrued. (*Id*. at p. 494.) The basis for the city's challenge is unclear from the published opinion. The appellate court said that in a case of property damage, interest should run from the date the damage is inflicted or at least from the commencement of suit. (*Id*. at pp. 494-495, quoting *Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746 (*Heimann*), overruled on other grounds in *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 679.)[21] The *Amador Valley Investors* court said, "Because the damages were continuous through the time of trial in July 1971, no one date would accurately reflect compensation from the date of damages. It is noted, however, that the date chosen by the trial court was well after suit was filed and approximately midpoint during the period in which damages occurred. Since damages were fairly evenly and regularly incurred throughout the period, the method chosen by the trial court appears to have been fair to all parties." (*Amador Valley Investors*, *supra*, 43 Cal.App.3d at p. 495.)

We cannot say the same in this case. Since we do not know which items of damages the jury awarded, we cannot say they were evenly incurred throughout the period. Moreover, the trial court here did not pick a midway point, but instead picked the day the lawsuit was filed–a choice that tipped the scale in plaintiff's favor.

We conclude the trial court erred in ordering defendant to pay prejudgment interest on all damages from the date the complaint was filed. As to remedy, we remand the matter to the trial court to determine an appropriate award of prejudgment interest.

---

[21] *Heimann* involved a landowner who sued a city for damage to real property. Citing cases from other states, the Supreme Court observed the " 'old rule' " was that interest was not allowed upon unliquidated damages, but the judicial trend was to set the rule aside in cases of injury to property in order to make the plaintiff whole and comport with condemnation cases in which statutes authorized interest when the government took private property. (*Heimann*, *supra*, 30 Cal.2d at p. 759.)

## DISPOSITION

The judgment is affirmed.  The postjudgment order (labeled "Amended Judgment") for attorney fees and prejudgment interest is affirmed as to the attorney fee award but reversed as to prejudgment interest and remanded to the trial court for a new determination of prejudgment interest in light of our opinion.  Plaintiff shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


       MURRAY      , J.


We concur:


    NICHOLSON   , Acting P. J.


    MAURO     , J.